## GEORGE CROCKER, EXECUTOR *v.* MARGARET CHASE'S ESTATE.*

*Will. Fraud. Undue Influence. Declarations of Testator, when not Admissible. Witness. Husband and Wife.* R. L. ss. 1003–5.

1. DECLARATIONS OF TESTATOR. The declarations of a testatrix, made subsequently to the execution of the will, *and at a time when she was of a sound mind,* are not admissible for the purpose of showing her mental condition when the will was executed. There is no logical relation between such declarations and the fact sought to be proved; although it is otherwise when mental unsoundness exists at the time the declarations are made.
2. The issues were, whether the testatrix was of sound mind, and whether undue influence had been exerted to procure the will; *Held,* that the declarations of the legatee, tending to show that she exercised such influence upon the testatrix, are admissible.
3. But such legatee, being a married woman and wife of one of the parties to the suit, is not a witness.
4. In such a case, evidence tending to show the pecuniary condition of the relatives of the testatrix, and their relation to her, is admissible.

APPEAL from the decree of the Probate Court, admitting to probate the alleged last will and testament of Margaret C. Chase, deceased. Pleas, that the will was not duly executed, in that the testatrix was of unsound mind; and that it was executed through the undue influence of George Crocker and his wife, Jane Crocker. Trial by jury, May Term, 1883, TAFT, J., presiding. Judgment for the defendant.

The will in question was executed April 22, 1879. Evidence was given upon all the material issues. Judge Porter was offered as a witness by the contestants, and allowed

* Heard, February Term, 1884.

to testify to declarations of the testatrix made in February, 1882. Mrs. Badger was allowed to testify, that in May, 1883, the testatrix declared to her that her will was wrong and not according to her husband's request; that it all went to Mrs. Crocker; and that she signed it because she was sick. This evidence, the proponent objecting, was admitted "for the sole purpose of showing the state and weakness of her [testatrix's] mind at the time the instrument was executed." Before Judge Porter testified to the declarations of the testatrix, Mr. Denison stated to the court:

"We object to any conversation or proof of any sayings of this testatrix relative to that will, except they shall be so near the time of the execution that they shall be a part of the *res gestæ,* otherwise we insist that the sayings she made about it are not admissible as matters of law. This conversation to which the witness' attention is now called is in February, 1882, and the will was executed in April, 1879, two years and ten months after the execution. I submit that, under the law, sayings of the testatrix at so late a day in regard to the execution of the will or the occasion of it are not admissible."

Mr. Johnson stated:

"We propose to show that he was called there as already stated, and saw Mrs. Chase; and she there told him of this writing, saying that she was sick and entirely incompetent to make any writing at that time; and the Crockers got it up and brought it to her and at their request she signed it; that she did not esteem it of any validity, because she was not competent to make it; that it was not right; and she wanted to get his opinion as to what she had better do. Thereupon he suggested that he of course could not tell whether the instrument was proper or not, never having seen it, advising her the safe way if she did not want it left in that way, was to make a new will, or a new instrument. And thereupon she told him that this matter had been talked over between herself and her husband during the life of her husband, and that it had been understood how their property was to go, after they both got through with it; that a small portion was to be set apart for the purpose of seeing to the cemetery; then she was to

make a couple of small bequests to some neighbors there, and the balance of the property to be equally divided between her nieces and nephews, who were these Brockway heirs; and she wanted that carried out in that way; because this arrangement up there was got up by the Crockers while she was sick, without her knowing anything about it, and it was the Crockers' and not hers." * * * *

Judge Taft. "You object to the offer on the ground that the declarations at so late a date are not evidence on the subject, showing that she was unduly influenced by the Crockers when she did make a will?"

Mr. Denison. "Yes, your honor."

Mr. Johnson. "We do not offer it on that branch. I desire to supplement my offer by proposing to show at that time that she had this talk with Judge Porter, that she was bright and in her right mind."

Mr. Denison. "That you will admit?"

(Mr. Johnson nods assent.)

Mr. Johnson. "Of course I expect that the court will take care of the testimony as it is offered. We are trying three issues. And of course we offer it on the ground of capacity and not on the ground of undue influence."

Judge Porter testified :

"Well, Mrs. Chase wanted to know my opinion, whether an instrument, executed in the way and manner that was, would be probated, admitted. As I held the office of judge of probate she asked me. She then stated the way and manner it was brought about; that she was very weak and knew but little what was going on; and did not know that Mr. Denison was sent for until he came there; knew nothing of his coming there to execute any paper until he came. And during the conversation she would sometimes say it was the Crockers' will, and sometimes Mr. Crocker's,—changed it in that way; that it was not her will, that it was the Crockers' will, or Mr. Crocker's will. And I inquired of her for the purpose of eliciting the facts, as near as I could, whether she did not know what was written in the instrument. She said she did understand that it was giving all her property to Mrs. Crocker. I asked her then why she signed it. Her reply was this: ' Mr. Porter, I was so sick I didn't care anything about my property.' I think those are the exact words. She remarked like this upon my sug-

gestion to her and asking her why she had not had another will drawn, if she did not want the property to go that way,—she replied to me that she did not suppose that instrument was good for anything; and that she had been told that it was not, that people had told her it was not; that she did not suppose it was good, and people told her it was not good; gave that as a reason for not changing it; and said during the conversation that it was all wrong, that it was not right; that she had some considerable property (I believe she stated somewhat the amount of it), and it was not right to give all to Mrs. Crocker; * * * * that the matter was talked up between her and her husband during his last sickness, that the property should go equally to their nieces and nephews together," &c.

The testimony of Lucy D. Head was as to declarations of the testatrix made subsequently to the execution of the will. She testified that Mrs. Chase told her, that she was sick when the will was made; "that they thought she was going to die"; that "they got up a writing," that "most that she knew about it was, when they brought it to her bedside and raised her up to sign it," &c.

The testimony of the proponent tended to show that the testatrix was of sound mind and understood the contents and nature of the instrument she was signing when the alleged will was executed; and no question was raised but that she was of sound mind when she had the conversations testified to by Judge Porter, Mrs. Head, and Mrs. Badger.

It was claimed by the contestant, and the evidence tended to show, that the testatrix had a sister Harriet who died in April, 1858, leaving property which was taken by the testatrix. Harriet's heirs were the testatrix and the children of a deceased sister, the mother of the contestant and his four sisters; and the contestant claimed that the property left by said Harriet remained in the hands of the testatrix by the consent of himself and sisters, and offered evidence of such facts for the purpose of showing the relations existing between the contestants and their aunt Chase. This evidence was admitted against the objection of the proponent. The

testimony tended to show that the testatrix recognized the claim of the Brockway children (the contestant and his sisters) to a share of their aunt Harriet's estate.

J. K. Cogswell, in favor of contestant, was allowed to testify to declarations of Mrs. Crocker, made in the winter of 1778-9; as that, "I am after the money now," speaking of Mrs. Chase. Evidence was admitted to prove that Mrs. Crocker proposed to the contestant, that she should go for the property of the testatrix and get it, and that he should get that of their father; also how much the Crockers were worth; also the responsibility of the father of the contestants, his ability to aid them, &c. Mrs. Crocker—the wife of said George Crocker—was offered by the proponent as a witness, but excluded.

*Denison & Son* and *N. L. Boyden*, for the plaintiff.

It was error to admit testimony as to the declarations of the testatrix, made after the execution of the will. *Robinson* v. *Hutchinson*, 26 Vt. 38; 1 Red. Wills, pp. 538, 546; *Provis* v. *Reed*, 5 Bing. 435; *Stevens* v. *Vanclave*, 4 Wash. C. C. 265; *Richardson* v. *Richardson*, 35 Vt. 398; 2 Greenl. Ev. s. 690; *Farrar* v. *Ayer*, 5 Pick. 63. There must be some connection between the state of mind at the time the declarations are made and the state of mind when the will was executed, or such declarations are not admissible. 1 Red. Wills, p. 549; *Jackson* v. *Kniffen*, 2 Johns. 31. The admissions of Mrs. Crocker were improperly admitted. *Sargeant* v. *Sargeant*, 18 Vt. 371; *Atkins* v. *Sawyer*, 1 Pick. 192; *Stevens* v. *Joyal*, 48 Vt. 291; *Hill* v. *Hill*, 2 Str. 1094; *Kelly* v. *Small*, 2 Esp. 716; *Alban* v. *Pritchett*, 6 Term, 680; *Davis* v. *Fuller*, 12 Vt. 178. She should have been allowed to rebut the testimony as to her sayings. *Judson* v. *Blanchard*, 4 Conn. 557; *Robinson* v *Hutchinson*, 31 Vt. 443.

*J. J. Wilson* and *William E. Johnson*, for the defendant. The court held in *Robinson* v. *Hutchinson*, 26 Vt. 38, that

27

declarations, made after the execution of the will, and so near the time of its execution, that a reasonable conclusion could be drawn as to the state of the testator's mind at the time the will was executed, were admissible. The whole case was before the jury; no exceptions were taken to the charge; the presumption is that the charge was in exact accordance with the law.

If this testimony is inadmissible by reason of the length of time after the execution of the will, we desire the court would tell us within what exact time such evidence would be admissible. We submit that no such rule can ever be established. All such testimony, when accompanied with other evidence having a tendency to prove weakness of mind and undue influence, is admissible, and, under proper instructions from the court, is proper for the consideration of the jury. Such instructions were given in this case, and there was other evidence pertinent to the issue. We submit there was no error in the admission of this evidence. *Comstock* v. *Hadlyme*, 8 Conn. 263; *Keene* v. *Kinne*, 9 Conn. 105; *Read* v. *Harris*, 32 E. C. L. 529; *McTaggart* v. *Thompson*, 14 Pa. St. 149; *Rambler* v. *Tryon*, 7 S. & R. 90; *Howell* v. *Barden*, 3 Dev. 442; *Hester* v. *Hester*, 4 Dev. 228; *Beabien* v. *Cicotte*, 12 Mich. 459; *Colvin* v. *Warford*, 20 Md. 357; *Waterman* v. *Whitney*, 1 Kern. 157; *Roberts* v. *Trowick*, 13 Ala. 67; 17 Ala. 55; *Denison's Appeal*, 29 Conn. 399; *Converse* v. *Wales*, 4 Allen, 512; 1 Red. Wills, p. 555. The evidence in reference to the property of the sister of the testatrix was admissible. *Fairchild* v. *Bascomb*, 35 Vt. 417. Also that as to the acts and confessions of Mrs. Crocker. 1 Red. Wills, 509.

The opinion of the court was delivered by

POWERS, J. The inquiry presented for consideration is, whether the declarations of the testatrix, made subsequent to the execution of her will, and at a time when she was confessedly of sound mind, and tending to impeach her will, are admissible. The will in question was executed April 22, 1879, and the declarations offered in evidence were

made in February and May, 1882. These declarations were admitted "for the sole purpose of showing the state and weakness of her (the testatrix's) mind at the time the instrument was executed."

It is settled on authority that such subsequent declarations cannot be received to establish any fact embodied in the declarations. Wills in writing cannot be impeached by parol statement any more than other written instruments. They cannot be revoked except in the manner pointed out in the statute.

But it is allowable to show that they were not duly executed in fact, by reason of fraud, imposition, or undue influence, or want of testamentary capacity.

The issue of undue influence made in this case covers not only the overt act of others, brought to bear upon the testatrix, but also her mental capacity to resist the influence of such acts.

However unduly interested parties may have exerted upon the testatrix such influence as they had, still if her mind had sufficient vigor to resist such influence, and did in fact resist it, and the will was the expression of her own choice, it is not impeachable. Language is an index of the mind. Mental disturbance is as surely detected by declarations as by conduct. Hence the declarations of persons charged with abnormal mental conditions are admissible in evidence to show the existence of such conditions.

But here, as in other cases, there must be some logical relation existing between the fact to be proved and the evidence offered to prove it. There is no such logical relation between a declaration made to-day and a mental condition existing three years ago. The declaration made to-day may show a mental condition to-day, but cannot do more. Its probative effect is exhausted when it elucidates the contemporaneous mental condition of the declarant. If the declaration shows mental unsoundness when it is made, such mental unsoundness may in certain cases be a *datum*,

whereby an earlier like unsoundness of mind may be inferred. If an unsoundness of mind be once shown to exist, and this unsoundness is of a fixed, permanent character, it is presumed to continue until the contrary be shown. So, too, it is both logical and lawful to reason backward, and conclude that a permanent condition of mental unsoundness, which customarily is the product of progressive development, must have required some antecedent lapse of time for its growth; and, therefore, if its later development be once shown, its earlier existence may be inferred. The strength of this inference is manifestly dependent upon the character of the unsoundness and the length of time that has elapsed between the fact that is known, and the fact to be proved, which is unknown. Subsequent declarations, therefore, are admissible in behalf of the contestants in support of the issue of incapacity or undue influence, provided they tend to show incapacity *at the time when they are made.* But if they have no tendency to prove such contemporaneous incapacity, they are not admissible against the will. In answer to declarations thus found admissible in behalf of the contestants, it would doubtless be competent for the proponents to introduce counter declarations tending to show an opposite condition of mind at or about the same time. This, we believe, is the true ground on which the admissibility of this class of evidence rests. Many cases can be found in which the rule has been more liberally expressed; but, if carefully sifted, it is believed that they have generally been anchored upon this ground.

In the leading case of *Robinson* v. *Hutchinson*, 26 Vt. 38, expressions may be found in the earlier part of the opinion apparently less restricted than the propositions here advanced. But in the concluding portion of the opinion the whole matter is set to rights. Says ISHAM, J.: "Weakness of mind arising from advanced age, in connection with causes suggested in this case, is progressive and permanent in character. It exists in the mind itself; and, *therefore*, it

is, that weakness of mind at the time of making the will may be inferred from weakness subsequent, as much so as imbecility of mind under similar circumstances."

It is evident that the *fact* of subsequent weakness of mind in that case, was the premise which led to the conclusion of weakness of mind at the earlier date when the will was made. The case is imperfectly reported. The declarations offered do not on their face import mental unsoundness. But this fact doubtless appeared in the case; otherwise it is difficult to see how the declarations tended to show weakness of mind at any time.

The general doctrine is discussed in Redfield on Wills, Pt. I. 548 *et seq.; Shailer* v. *Bumstead,* 99 Mass. 112; *Smith* v. *Fenner,* 1 Gall. 169. The declarations testified to by Judge Porter, Mrs. Badger, and Lucy D. Head, were therefore inadmissible.

We think the declarations of Mrs. Crocker, tending to show the exercise of undue influence by her upon the testatrix, were admissible. She was interested to have this will sustained. It was attacked on the ground that she had improperly secured an advantage by its execution. Her sayings, therefore, indicating her purpose to obtain such advantage, are evidence supporting the issue of undue influence.

But Mrs. Crocker, being the wife of the executor, who is the *party* to this cause, cannot be admitted as a witness, notwithstanding the apparent injustice of proving her sayings against her by living witnesses.

Husbands and wives cannot be witnesses for or against each other, except in the instances named in R. L. s. 1005; and this case cannot be brought within s. 1003. *Cram* v. *Cram,* 33 Vt. 15.

Evidence tending to show the relation of a testator to the natural objects of his bounty, and their pecuniary condition, is admissible in cases of this kind. The natural claims of kinship are usually recognized by testators in meting out

their bounty. If such claims are ignored, it is a circumstance that bears upon the issue of undue influence as well as of incapacity.

Judgment reversed and new trial granted.