(March 26, 1897.)

# GWIN v. GWIN.

[48 Pac. 295.]

SPECIAL VERDICT.—When the special finding of facts made by a jury is inconsistent with the general verdict, the former controls.

SAME—NEW TRIAL.—When the special facts found by the jury are contradictory or inconsistent upon a material issue, a new trial must be granted.

SPECIAL FINDING—TRUE TEST.—As to whether the special findings are contradictory or inconsistent, the true test is whether they would warrant a different judgment from the one entered.

TESTAMENTARY CAPACITY—INSANE DELUSION.—The special finding of the jury that a testator was competent to make the will in question, at the time it was made, is in conflict with findings that the testator was laboring under an insane delusion, and was not of sound and disposing mind.

UNDUE INFLUENCE—SOUND AND DISPOSING MIND.—A finding that a will was made under duress and undue influence presupposes testamentary capacity, or a sound and disposing mind.

IMPEACHING WILL—EVIDENCE—ATTESTING WITNESS.—Where an attesting witness undertakes to impeach the will, his testimony should be received with the utmost caution.

DECLARATION OF TESTATOR.—The declarations of a testator made after the execution of a will showing his dissatisfaction therewith, and his intention to execute a new will, are not admissible to show that said will was executed under duress or undue influence.

SAME.—A will cannot be impeached by the subsequent oral declarations of the testator.

SAME.—Such declarations are entitled to no weight, in the absence of proof of undue influence, as to the testamentary act complained of.

RELATION OF PARTIES—UNDUE INFLUENCE.—No presumption of the exercise of undue influence arises in this case by reason of the relation of the parties, or that the wife had opportunity to exercise such influence.

INSTRUCTIONS.—Instructions stating abstract principles of law when there is no evidence in the case to warrant them should not be given.

(Syllabus by the court.)

APPEAL from District Court, Cassia County.

W. L. Maginnis and Hays & Johnson, for Appellant.

There must be affirmative evidence of the facts or acts of undue influence before the declarations of testator are admis-

sible. (*Cudney v. Cudney*, 68 N. Y. 148; *In re Hess' Will*, 48 Minn. 504, 31 Am. St. Rep. 665, 51 N. W. 614.) In the case at bar no facts of undue influence are testified to, therefore ·the alleged declarations should have been excluded. Declarations made after the execution of the will are inadmissible. (*Leslie v. McMurtry*, 60 Ark. 301, 30 S. W. 33; *Mason v. Williams*, 53 Hun, 398, 6 N. Y. Supp. 479.) Even if admissible and true, the facts, the declarations in evidence, do not :amount to undue influence. (*In re Jackson*, 26 Wis. 104; *In re McKenna*, 4 N. Y. Supp. 458; *Trost v. Dingler*, 118 Pa. St. 259, 4 Am. St. Rep. 593, 12 Atl. 296.) The capacity of testator at the time of making the will is the sole question to be determined in deciding upon the validity of a will on that ·ground. (*Kinne v. Kinne*, 9 Conn. 102, 21 Am. Dec. 732; *Kerr v. Lunsford*, 31 W. Va. 659, 8 S. E. 498.) Undue influence is a fact for the court or jury to determine, not for opinion testimony. (*O'Connor v. Madesin*, 98 Mich. 183, 57 N. W. 105; *In re Blood*, 62 Vt. 359, 19 Atl. 770; *Stackhouse v. Horton*, 15 N. J. Eq. 202.) The subscribing witness cannot testify to capacity from what he has seen since its execution. · (*Williams v. Spencer*, 150· Mass. 346, 15 Am. St. Rep. 206, 23· N. E. 105; *Chrisman v. Chrisman*, 16 Or. 127, 18 Pac. 12; *Loughney v. Loughney*, 87 Wis. 92, 58 N. W. 250.) When findings are contradictory on a material point a judgment cannot be sustained. (*Manly v. Howlett*, 55 Cal. 94; *Reese v. Cochran*, 52 Cal. 495.) When the findings are inconsistent a new trial should be granted. (*Shoemaker v. Railroad*, 30·Kan. 359, 2 Pac. 517; *Kerns v. McKean*, 65 Cal. 411, 4 Pac. 404; *Learned v. Castle*, 78 Cal. 454, 18 Pac. 872, 21 Pac. 11; *McBride v. Railroad*, 3 Wyo. 247, 21 Pac. 687; *Chicago etc. R. R. v. Townsdin*, 38 Kan. 78, 15 Pac. 889; *Aultman v. Mickey*, 41 Kan. 348, 21 Pac. 254; *Deatherage v. Henderson*, 43 Kan. 684, 23 Pac. 1052; *Sloss v. Allman*, 64 Cal. 47, 30 Pac. 574; *Union Pacific R. R. v. Sternbergh*, 54 Kan. 410, 38 Pac. 486; *Hewson v. Saffin*, 7 Ohio (pt. 2), 232.) The true test as to whether special findings are inconsistent either in themselves or with a general verdict is whether they would authorize a different judgment as well as the judgment which is entered. (*Loewenberg v. Rosenthal*, 18 Or. 178, 22 Pac. 601.),

Hawley & Puckett, for Respondent.

We call the court's attention to what is meant by the term "undue influence." (Black's Law Dictionary, 1200; *Haydock v. Haydock,* 34 N. J. Eq. 570, 38 Am. Rep. 385; Pomeroy's Equity Jurisprudence, 951; Rice on Probate Law, 229 et seq.) It is the rule that the evidence of a subscribing witness is entitled to great weight. (*Massey v. Huntington,* 118 Ill. 80, 7 N. E. 269; *Buckey v. Buckey,* 38 W. Va. 168, 18 S. E. 383.) Findings must be construed together. (*Polack v. McGrath,* 38 Cal. 666.) Where a question arises as to the construction of findings, they must all be read together to ascertain the exact shade of meaning intended. (*Kimball v. Lohmas,* 31 Cal. 154; *Milliard v. Hathway,* 27 Cal. 119; *Schultz v. McLean,* 93 Cal. 329, 28 Pac. 1053; *Tage v. Alberts,* 2 Idaho, 271, 13 Pac. 19; *Mott v. Ewing,* 90 Cal. 231, 27 Pac. 194; *Winterburn v. Chambers,* 91 Cal. 170, 27 Pac. 658.) Appellant contends that if a person cherishes an insane delusion, or is under undue influence, he cannot make a will. This is an erroneous view of the law. These matters will avoid a will when made, or it may not be a valid will when made, but the document is a will for all that. (Rice on Probate Law and Practice, 209, 210, 218, and cases cited.)

SULLIVAN, C. J.—A written document purporting to be the last will and testament of Samuel R. Gwin, deceased, by which he bequeathed substantially all of his estate and property to his wife, Minnie Gwin, and appointed her executrix thereof, without bond, was presented to the probate court of Cassia county for probate. Prior to the day set for hearing said matter, Frank P. Gwin, son of the deceased, filed written grounds of opposition to the admission of said will to probate. The grounds of the contest, as set forth in said written opposition or complaint, are as follows: 1. That the deceased, at the time of making said pretended will, was incompetent to make said will or any will; 2. That said pretended will is not the will of said deceased; 3. That, at the time of the alleged signing of the pretended will, said deceased was laboring under and had an insane delusion as to the contestant; 4. That, at the time of the alleged signing of said pretended will, said

deceased was not of sound and disposing mind; 5. That, at
the time of the alleged signing of said pretended will, the de-
ceased was under duress, undue influence, passion and preju-
dice against the contestant. The particulars on which the last-
mentioned ground is based are minutely set forth, but it is
not necessary to insert them here. The complaint or written
opposition is not verified. The proponent or contestee by her
answer put in issue all of the material allegations of said com-
plaint. After the hearing in the probate court said will was
admitted to probate, and letters testamentary issued to contestee
in accordance with the directions of said will. Thereupon an
appeal was taken to the district court, where the case was tried
anew by the court, with a jury. At the close of the testimony,
special issues were submitted to the jury, and after receiving
certain instructions from the court the jury retired to consider
of their verdict. After answering the questions submitted, they
returned a general verdict in favor of the contestant. The
questions submitted to the jury, and answers thereto, were as
follows: "1. Was Samuel R. Gwin, the deceased, at the time
of making the will in question, competent to make said will?
A. Yes. 2. Is the will in question the last will and testa-
ment of Samuel R. Gwin, deceased? A. Yes. 3. Did the
deceased, at the time of making the will in question, have an
insane delusion as to plaintiff? A. Yes. 4. Was the deceased,
at the time of making said will, of sound and disposing mind?
A. No. 5. At the time of making the will in question, was
the deceased under duress and undue influence? A. Yes."
The court thereupon rendered and entered judgment in favor
of the contestant, denying the probate of said will, and revok-
ing and setting aside the letters testamentary theretofore is-
sued by the probate court. A motion for a new trial was made
by the contestee, and denied by the court. Thereupon this
appeal was taken from said order denying the motion for a
new trial. The errors assigned are numerous, and go to the
admission of certain testimony, the insufficiency of the evidence
to justify the verdict, to the giving and refusing to give certain
instructions; and the insufficiency of the verdict to sustain the
judgment.

It appears from the transcript that Samuel R. Gwin, the de-
ceased, left the state of California in 1872, with three children,

Frank P., William L., and Mary F., their mother being dead.
For several years thereafter he engaged in different kinds of
business, principally trading and freighting, in Dakota and
Wyoming. In 1878 he settled in Cassia county, Idaho, in
which county he purchased a ranch and several thousand head
of livestock, mostly cattle. The daughter married a man by the
name of March. The deceased gave the two sons and son in
law an interest in a certain brand of cattle, and subsequently,
in 1880, bought them out at the stipulated price of $6,000
each. Shortly after, the contestant, Frank P. Gwin, moved
to his own ranch, and, as the record shows, held very little com-
munication with the deceased—so little, in fact, that he did not
see the contestee till about five years after her marriage with
his father. After making the purchase of cattle in 1878, the
deceased was absent much of the time, and the contestant and
his brother had charge of their father's business in Idaho. In
the spring of 1881 the deceased gave the contestant three hun-
dred and six cows and three hundred and six calves. He also
gave him horses, money, and other property, the value of which
does not appear. The deceased married Minnie Gwin, contestee,
in 1881, and took her to his ranch in Cassia county in March,
1882. Thereafter the deceased and contestee labored continu-
ously to increase their possessions. Mrs. Gwin had about $5,800
at the time of her mariage, which she loaned the deceased for
investment in his business. The son William continued to
work for the deceased some time after Frank P. Gwin went to
the latter's ranch, and it appears that William did not please
the deceased, which resulted in a settlement and separation.
In 1887 the deceased was injured by a vicious bull, and dur-
ing the sickness that followed the contestant was with him for
about two weeks. There the contestant met the contestee for
the first time subsequent to her said marriage with the deceased.
That from the date of said marriage the contestant had met
the deceased but six or seven times prior to the date of his
death. The record shows that prior to the injury received from
the bull the deceased was very strong, physically and mentally;
that he conducted an extensive business, and was a keen, shrewd
business man. On the twenty-sixth day of February, 1882,
deceased made a will, by the terms of which he disposed of his

property in the same manner as by the will in question. On the twenty-third day of July, 1883, he re-signed, resealed and republished said will. At the time said will was made and re-signed, it is admitted that the decedent was competent to execute a will. In 1889 the decedent purchased or traded for a large ranch located in the state of California, and in that year took possession of the same, and engaged from thence to the date of his death quite largely in fruit raising. His wife, the contestee, remained in Idaho, with the exception of a few ·months, and, under his direction and advice, managed his stock business and farming in this state, until the date of his death, the seventeenth day of September, 1894. On the eleventh day of April, 1890, the deceased made the will in question, at the city of San Francisco, state of California. Said will was drawn by Horace Hawes, Esq., an attorney at law, and was witnessed by him and one Frederick C. Cliff. It appears that the deceased had consulted said Hawes in regard to deeding certain property to the contestee, the deed to be delivered to her after decedent's death. Said Hawes advised him, by letter dated March 24, 1890, that the safest way for deceased to do was to make a will, and thereby appoint said wife executrix thereof, giving her full power to act without authorization of any court, and without giving bonds. It is shown that the deceased followed the advice so given by making said will about two weeks after the date of said letter. It also appears that the will executed by decedent on the twenty-sixth day of February, 1882, had been left with said Hawes at the time of, or prior to, the ·preparation of the will in question. After the execution of the will in question the deceased resided on his ranch near Cordelia, state of California, until a short time prior to his death, when he returned to Idaho.

It is contended by the appellant that there is an irreconcilable conflict between the special findings of the jury on the special issues submitted, and for that reason the court erred in entering judgment on said verdict, and that, as said verdict finds two inconsistent material facts, it is void, and cannot be the foundation for a legal judgment. Under the first special issue submitted, the jury found that the deceased, at the time of making the will in question, was competent to make the

same, and under the second they found that the will in question was the last will and testament of said deceased. Those two findings decide the first four issues made by the pleadings in favor of the appellant or contestee. The jury found that decedent was competent to make said will, and that he did make it. Those findings negative the allegations that decedent was incompetent by reason of insane delusions, or by reason of not possessing a sound and disposing mind. The jury rendered a general verdict in favor of the contestant, but the special finding of facts will not sustain it. Under the provisions of section 4396 of the Revised Statutes, the special verdict must present the conclusions of fact, so that nothing shall remain to the court but to draw from them the conclusions of law; and section 4397 of the Revised Statutes declares that, when the special finding of facts is inconsistent with the general verdict, the former controls the latter, and the court must give judgment accordingly. The general verdict is not sustained by the special finding of facts; hence the general verdict cannot be sustained. And the special finding of facts is so contradictory and inconsistent that no conclusion of law can be drawn from it. When the special finding of facts is contradictory and inconsistent on a material issue, a judgment rendered thereon cannot be sustained and a new trial should be granted. (*Manly v. Howlett,* 55 Cal. 94; *Reese v. Corcoran,* 52 Cal. 495; *Kerns v. McKean,* 65 Cal. 411, 4 Pac. 404; *Learned v. Castle,* 78 Cal. 454, 18 Pac. 872, 21 Pac. 11; *Sloss v. Allman,* 64 Cal. 47, 30 Pac. 574.) The first two special facts found by the jury would justify a verdict in favor of the contestee, and the subsequent three would warrant a verdict and judgment in favor of contestant. The true test as to· whether special findings are inconsistent and contradictory, either in themselves or with the general verdict, is whether they would authorize a different verdict or judgment from that given. (*Loewenberg v. Rosenthal,* 18 Or. 178, 22 Pac. 601.) Regardless of the fact that the jury found, under the first special issue, that the decedent was competent to make said will at the time he made it, they found, under the third special issue, that at the time said will was executed the deceased had an insane delusion as to the contestant, and under the fourth

they found that deceased was not of sound and disposing mind when he made said will. We have carefully examined the evidence upon the third and fourth issues, and find no evidence sustaining them, or even tending to do so. The contestant testified on his own behalf, and failed to testify to a single circumstance, act or word on his father's part tending to show that the decedent, at the time of making the will in· question, was laboring under an insane, or any, delusion, or tending to sustain any of the allegations of his complaint. He testified: "The last time I saw my father was—at Marsh Creek, I believe—in 1891 or 1892. Saw him then for two or three hours. Before that, saw him in Shoshone, on February 6, 1890, when he stayed at my house until late in the evening. In all, I think I saw him six or seven times after his illness," in September, 1887. The record contains several letters that passed between contestant and the deceased, all of which indicate a very friendly relation between them, and also prove that deceased was competent to write intelligent business letters. Under date of April 17, 1890, six days subsequent to the execution of the will in question, he wrote as follows to the contestant: "Dear Son: I will send you to-day one box of grape cuttings, about 4,200," etc. On April 30, 1890, the decedent wrote to his son William as follows: "Dear Son: I received yours several days since. Will say. I am short on money matters. Did not sell my mules in California. On account of very hard winter on stock, they were thin in order. Won't sell them before fall, so I am short now. Let me hear from you. I here send you deed to sign. Please sign it and return it." Contestant established by his own witnesses, Mansfieldt and wife and Rev. Waugh, that the deceased thought a great deal of his children, and repeatedly told them that he intended to leave them well provided for by his will. There is not a scintilla of evidence in the record to support the findings that the deceased was laboring under an insane delusion when he signed said will, or that he was not of sound and disposing mind.

It is very apparent that the main reliance of contestant was based upon the fifth special issue submitted to the jury, to wit, that, at the time of making the will in question, deceased was under duress and undue influence. The finding on that issue

is in contradiction of their third special finding, to wit, that deceased was not of sound and disposing mind. A finding of duress and undue influence presupposes a sound and disposing mind. Duress and undue influence cannot operate upon one who is not of sound and disposing mind. When the jury found that the testator was not of sound and disposing mind, they failed to comprehend the fact that such a person, in law, was not, and could not be, controlled by undue influence. The underlying idea in "undue influence" is that the will of another is substituted for that of the testator. If the testator have no will or testamentary capacity, there can be no substitution of another's will for that of the testator. One who does not possess a sound and disposing mind has no testamentary capacity. Undue influence cannot affect one who has no capacity. (27 Am. & Eng. Ency. of Law, tit. "Undue Influence.") Thus it is shown that the findings are very contradictory. The first and second would support a judgment for the contestee, and the third, fourth and fifth would support a judgment for the contestant. We will proceed to test said fifth special finding by the evidence.

In support of that issue the contestant introduced the depositions of Horace Hawes, Esq., who drew said will and signed it as a subscribing witness. Said Hawes had been employed by the deceased as an attorney at law at different times from 1888 to 1893, and had charge of some important suits for him. At the time said will was signed said witness was of the opinion that the testator was mentally competent to dispose of his property by will or deed, but some years afterward he changed his mind as to testator's competency. A few quotations from his testimony will suffice. He deposed: "Although I did not consider Mr. Gwin physically sound, or as able mentally as he had been, I think he understood what he was doing." "I consider the will was made wholly under the influence of Mrs. Gwin." He at first deposed that Mrs. Gwin was present when the will was signed, but later stated, "to the best of my memory." In his second deposition, taken May 13, 1895, over five years after said will was executed, he deposes that Mr. and Mrs. Gwin came to his office, and requested him to draw a will whereby the bulk of his property should be left to Mrs. Gwin. He de-

posed as follows: "Q. State whether or not—as near as you can, from your knowledge—the said Samuel R. Gwin appeared to be under any restraint, undue influence or fraudulent representation in the making of said will? A. Well, my opinion is, the gray mare is the better horse of the two. Q. Well, of course, the only object of that is, it was asked in the other deposition. That is the reason the question is asked in that way. Did you answer? A. Well, I don't know about undue influence or fraud, or anything of that kind. It seemed to me the idea was, they had come to have the will drawn in that way. Whether there was any undue influence about it, of course, I don't know anything about it." And further: "Well, about that I can only say Gwin appeared to me to be an old man, physically disabled, and, as one might say, tottering on the brink of the grave. The woman was a woman possessed with full vigor, and of a will of her own. Now, whether there was any undue influence about it I don't know; but she seemed to carry the mind of the concern, and evidently the will was made to suit her ideas. I think Mr. Gwin was both a physical and mental wreck. Q. Did he, in your opinion, based upon your business dealings with him, and your observation of his action and general demeanor at the time the will in question was made, act freely and voluntarily in signing the same? A. Well, from what I knew at that time, I considered that he was making the will himself." The question being repeated, the witness answered: "Oh, I think he did. The distinction between those two questions is this: I understood this question to be asking my opinion at that time of what I thought—at that time, as to whether he was acting freely and voluntarily. But the former questions, I understand, is asking my opinion of what I have known since. Now, from what I know now, I don't think he was acting freely and voluntarily at that time. From what I thought then, I thought he was." He further deposed: "It is very likely that my opinion at this time is based largely on what I have learned of the man since that time [date of making the will]. My opinion now is that he was not competent to transact important business. Q. At that time did you then consider him mentally and physically competent to dispose of his property by will, or, I will say, execute a will?

A. At that time I probably did think so, undoubtedly thought so, or I would not of drawn his will.   Q. Well, do you know any fact occurring from the time you wrote that letter, March 24, 1890, up to April 11, 1890, when the will was drawn, that would indicate to you any undue influence on the part of Mrs. Gwin or any other person? · A. I know nothing of my own personal knowledge." The deposition of this witness was introduced for the purpose of impeaching the will. He drew the will, and signed it as an attesting witness. He deposed that at the time the will was made he believed the testator was mentally and physically competent to dispose of his property by will, but, during the five years that intervened between the execution of the will and the date of taking his deposition, he had heard something that caused him to change his mind. He fails to state any fact or circumstance that caused him to change his opinion. He saw Mrs. Gwin once or twice before the will was executed, but does not depose that by any word, circumstance or action she endeavored to control the testator in the execution of said will, or to influence him in any manner. Deponent had been the attorney of deceased for a year or more before the execution of said will, and had opportunity to observe his conversation, demeanor and actions, and with considerable reluctance, on cross-examination, admitted that he was of the opinion that deceased executed said will freely and voluntarily, and without undue influence. Deponent signed said will as an attesting witness, and by that act solemnly declared the competency and capacity of the testator, and that he was of the opinion that such will was executed freely and voluntarily. When an attesting witness attempts to impeach the will, his evidence will be received with suspicion and utmost caution. (*Lamberts v. Cooper*, 29 Gratt. 61.)   The memory of this witness was shown to have been somewhat defective. When first interrogated, he deposed that he had no recollection of having advised the testator to make a will instead of a deed. But when confronted with his letter dated March 24, 1890 (above quoted), he, with apparent reluctance, admitted that he had so advised him. He also deposed that Mrs. Gwin was present when the will was executed. In that he was contradicted by Mrs. Gwin and his coattesting witness, Frederick C. Cliff.

The subsequently formed opinion of this subscribing witness was based on what he had heard subsequent to the execution of the will, and should not have been admitted in evidence. (*Williams v. Spencer,* 150 Mass. 346, 15 Am. St. Rep. 206, 23 N. E. 105. See, also, *Chrisman v. Chrisman,* 16 Or. 127, 18 Pac. 6.)

The contestant introduced the deposition of Earnest Mansfieldt, which shows: That said deponent first became acquainted with the deceased on July 25, 1893. That he was employed by the testator as a laborer, and was quite intimate with him. That the deceased complained of his wife, Mrs. Gwin, to deponent. That he said she was extravagant; that she had separated him from his children; that he had made a will in her favor, but that he would change it and leave the largest part of his estate to his children. That he accused his wife of stealing a finger ring and a will that he had executed; that she would not allow his boys to come near him; that she was afraid, if he had his children near him, she would not get anything; that, if she behaved herself as a good wife, he probably would do what was right; that she was a drunkard; that all she was good for was to misuse him because he would not turn his property over to her; that she was in Idaho, and he wished she would stay there. That deponent had a quarrel with Mr. Gwin, and he thought Gwin was a little weak in the mind. That he had seen Mr. and Mrs Gwin together, and had never seen her treat him cruelly, "except her using profane language." The record shows that witness Mansfieldt attempted to extort money from Mrs. Gwin under the pretense that he had in his possession a will made by Mr. Gwin. He wrote Mrs. Gwin two letters over the name of "Mickie Drake." The first one he closed with the following suggestion: "Now, do what you please, and be wise." In the second letter he says: "I herewith tell you once more I have those papers, and that settles it. Now, if you do not agree with me, I will represent them where you would not like to have them." Thus it is shown that witness Mansfieldt had another occupation than that of working fruit, and that his wife (witness Bertha Mansfieldt) was cognizant of that fact.

Mrs. Mansfieldt deposed that she became acquainted with deceased in July, 1893; that deceased employed her to work in fruit, and cook; that deceased complained to her of his wife, the contestee; that he said once, "If I had a wife like Mrs. Mansfieldt, I would be a different man"; that he never told her about losing a will; that she never had a conversation with deceased about a will; that she first became acquainted with the contestee in September, 1893. This witness relates conversations which she claims to have had with Mr. Gwin and which Gwin had said he was afraid of Mrs. Gwin; that she had "blacked" his eye; that she went after him with a knife. That the deceased was forgetful and made mistakes. Witness Mansfieldt deposed that Mr. Gwin had told him that some one had stolen a will and a finger ring from him, and he accused Mrs. Gwin of the theft; that he offered Mansfieldt a reward to recover them—while Mrs. Mansfieldt deposed that Mr. Gwin told her that he had lost a finger ring and pictures of his daughter and children and accused Mrs. Gwin of taking them, but that he never mentioned losing a will to her. It is a little surprising that deceased never mentioned the fact of having lost a will to Mrs. Mansfieldt, and accused Mrs. Gwin of taking it, when her whole testimony would indicate that she was on such very intimate terms with deceased.

Contestant also introduced the deposition of B. J. Waugh, which shows that the deponent first became acquainted with Mr. Gwin in July, 1892; that said Waugh first met Mrs. Gwin in August or September, 1893, when Mr. Gwin was quite sick; that he had a long conversation with deceased, in which he spoke very bitterly against his wife and very kind of his children. The witness details at length the declarations made, or claimed to have been made, by the deceased at that time, which we do not deem it necessary to set forth here. Such declarations were not made in the presence of Mrs. Gwin, and are merely hearsay. The witness deposes: That, on the next day after having the conversation above referred to, he went to see Mr. Gwin, and in the meantime Mrs. Gwin had arrived; also, Mr. March, the son in law of Mr. Gwin. That very little was said on that visit, and as he left the house he stopped in the

yard, and while he was there, talking to Mr. March, Mr. Gwin came out and told witness to leave the place; that he was there finding out things about Mr. Gwin's business, and was having an influence over him; that deceased was not in a condition to talk, etc.

Herman H. Albers, a witness for contestant, testified to declarations claimed to have been made to him by Mr. Gwin in 1891 and 1892—among them, that deceased stated he was afraid that the house would be burned by Mrs. Gwin because he would not do what she wanted him to; that he called witness' attention to some matches which he claimed Mrs. Gwin had left there, and said that he had heard some one there the night before, and was afraid of being burned out. The witness admitted that Mrs. Gwin was in Idaho at the time referred to. Later, witness was not on speaking terms with Mr. Gwin. The record contains letters written by this witness to the probate judge of Cassia county and to Mrs. Gwin that revealed his true character and the utter worthlessness of his testimony, provided the declarations of deceased, made long after the making of said will, were competent to impeach it, which they are not.

Other witnesses testified to declarations claimed to have been made by Mr. Gwin in regard to his feelings toward the contestee and his children. The declarations of deceased, as testified to by the various witnesses, were admitted, over the objections of contestee, to establish the issue of undue influence, and were improperly admitted.

It appears from the transcript that the deceased had made a certain deed whereby he conveyed certain land to the contestee, and deposited the same with Horace Hawes, Esq., of San Francisco, Cal., and that on January 19, 1893, Mrs. Gwin wired said Hawes to forward the deed to her, and signed the name of "S. R. Gwin" to the telegram. The deed was forwarded as requested, and Hawes thereupon brought suit against Gwin for $1,000, claimed to be due for legal services. Mr. Gwin then wrote to said Hawes in regard to said suit, and Hawes replied on January 31, 1894, to which last-mentioned letter Gwin replied under date of February 3, 1894, in which letter he states that Hawes' letters explained the mystery about

the bringing of said suit.  He also wrote: "No, I never sent you a message for the deed to be sent to my wife.  It was a forgery.  Never knew anything about your sending it to her until you sent me the telegram. . . . . My wife's people have put her up to what she has done."  And he requested Hawes to get the deed back from Mrs. Gwin.  Mrs. Gwin wrote to said Hawes under date of January 24, 1893, in which letter she says: "S. R. Gwin sent me registered letter on the eighth day of January, 1893.  After that I telegraphed for the deed.  Mr. Gwin knew nothing about it, but it was understood I was to have the deed.  It is only to protect me from Mr. Gwin's people.  I am sorry you should think he would beat anybody." What the final termination of this matter was, the record fails to disclose.  But it appears to have been settled satisfactorily to all concerned.  Mr. Gwin conducted his large business interests for some eighteen months thereafter up to about the time of his death, which occurred in September, 1894, and made no change in the provisions of the will in question.

There is no direct evidence in support of the findings of undue influence.  Certain declarations of the testator, made months, and some of them years, subsequent to the making of said will, were admitted, over the objections of contestee, in support of that issue.  The rule is well established that such declarations are incompetent to show either that undue influence was exercised, or that it affected the testator's actions, except as such declarations may illustrate his mental state and give a picture of the condition of his mind at the time such declarations were made.  (*Calkins' Estate,* 112 Cal. 296, 44 Pac. 579; *Cudney v. Cudney,* 68 N. Y. 149; *In re Hess' Will,* 48 Minn. 504, 31 Am. St. Rep. 665, 51 N. W. 614; *Leslie v. McMurtry,* 60 Ark. 301, 30 S. W. 33; *Shailer v. Bumstead,* 99 Mass. 112; *Crocker v. Chase's Estate,* 57 Vt. 413; *Herster v. Herster,* 122 Pa. St. 239, 9 Am. St. Rep. 95, 16 Atl. 342; *Guild v. Hall,* 127 Ill. 523, 20 N. E. 665.)  In *Calkins' Estate, supra,* in referring to subsequent declarations of testatrix as evidence, the court says: "But to the extent that they purported to be declarations of the acts of others, or of her own acts, they were but matters of hearsay, merely,

whose truth rested in the veracity of the utterer, and upon
which there was no opportunity of cross-examination, or of
explanation by the parties who uttered them, and were not en-
titled to any weight by the jury, and cannot be considered for
the purpose of sustaining their verdict." (Also, see 27 Am.
& Eng. Ency. of Law, tit. "Undue Influence.") It is also
well settled that a testator cannot impeach the validity of his
will by any subsequent oral declarations, any more than can
a maker of any other written instrument thus impeach its
validity. (*Calkins' Estate,* 112 Cal. 296, 44 Pac. 577. See,
also, *Kirkpatrick v. Jenkins,* 96 Tenn. 85, 33 S. W. 819; *Mid-
dleditch v. Williams,* 45 N. J. Eq. 726, 17 Atl. 826.) The
most that could be claimed for the declarations of deceased
made after the execution of the will is that they showed his
dissatisfaction with it, and his feelings toward his wife and
children, but such declarations could not be admitted to prove
the fact of undue influence. And where, as in this case, the
testator was of sound and disposing mind, such declarations are
entitled to no weight, in the absence of proof of undue in-
fluence as to the very testamentary act complained of. (*Her-
wick v. Langford,* 108 Cal. 608, 41 Pac. 701; *In re Hess'
Will,* 48 Minn. 504, 31 Am. St. Rep. 665, 51 N. W. 614; *In
re McDevitt,* 95 Cal. 17, 30 Pac. 101.) Where it appears
that the testator was of sound mind at the time of making his
will, it is not sufficient to show that the circumstances attend-
ing its execution are consistent with the hypothesis of its
having been obtained by undue influence. It must be shown
that such circumstances are inconsistent with a contrary hy-
pothesis. (27 Am. & Eng. Ency. of Law, p. 501, note 5.) To
be effective, it must be shown that such influence was present
and operating on the testator's mind at the time he executed
his will. In this case no presumption of the exercise of un-
due influence arises by reason of the relation existing between
the testator and his wife, or that the wife had opportunity to
exercise such influence. (Bigelow's Jarman on Wills, 6th
Am. ed., 69.) The fact that a wife guides or even dominates
her husband in the ordinary affairs of life, or has acquired an
ascendency over him, does not render his will made in her
favor invalid. (*Small v. Small,* 4 Me. 220, 16 Am. Dec. 253,

and note.)    The mere fact that a testator's wife urged on him
the propriety of leaving his property to her, though he had
children by a former wife, does not constitute undue influence.
(*Herwick v. Langford,* 108 Cal. 608, 41 Pac. 701.)    In the
case at bar it is not shown that the contestee ever requested or
urged the testator to leave his property to her, or influence
him in that regard.    The evidence clearly shows that the
making of the will in question was the free and voluntary act
of a competent testator.    The evidence is conclusive that at
the time of the execution of the will dated February 25, 1882,
and republished July 23, 1883, the testator was thoroughly
competent to make said will.    That will is identical, in effect,
with the will in question, except by the latter the contestee is
appointed executrix thereof without bond.    The will in ques-
tion was made April 11, 1890, and remained subject to change
or cancellation at the pleasure of the testator up to the time
of his death, in September, 1894, but was not changed or can-
celed.    This fact deserves consideration.    In *Hoshauer v. Hos-
hauer,* 26 Pa. St. 404 (a will contest, in which undue influ-
ence was the issue), the court said: "A man who is competent
to make a will can so easily correct any of its provisions, how-
ever obtained, that it is hard to imagine any kind of declara-
tions of his that would prove it to be fraudulent, when any
considerable time has intervened between its execution and
his death."    In the case at bar the will of testator remained
under his care and control about four and one-half years, from
April 11, 1890, to September, 1894, the date of his death, and
no change was made.    In fact, the will executed in February,
1882 (which was the same as the will in question, so far as the
distribution of the property of the deceased was concerned),
remained in existence up to the date of the execution of the
will in question.    Thus, it is shown that deceased concluded
to bequeath the bulk of his property to the contestee in 1882,
and at that time executed a will to that effect, and kept its
provisions alive for more than twelve years, or from February,
1882, until his death, in September, 1894.    The evidence
shows that the testator was an energetic, keen, shrewd business
man, and at the date of making the will in question was carry-
ing on a fruit and stock ranch of over eight hundred acres in

the state of California; was engaged in important litigation, and also managing a large stock and farming business in Idaho; that he employed many men, and looked after his own business. His neighbors and acquaintances testified as to his competency to understand and manage business transactions. The following are quotations from the testimony: "I always considered him perfectly rational, and a good business man." "In the spring of 1890 I thought him perfectly rational and competent." "His mental condition was good." "He impressed me as being perfectly competent—as having his own mind, and capable of doing business." "Thought him a stubborn man. He was a close, straight dealer, and always understood his business." "Bought cattle of him in 1890. Took him to be sane enough at that time." "His method of business was straightforward and rational. His mental condition good." "He was quite intelligent." "Saw Mr. Gwin just before and after the will was executed. His mental and physical condition then was sound." In addition to the oral evidence, the record contains letters and written contracts of the deceased which go to show his mental condition just prior and subsequent to the execution of said will. Those writings show that the testator was a man of more than ordinary mental ability. His letters to his sons in regard to land transactions, gathering and sale of stock and in regard to the management of the California ranch, all indicate that the testator had a mind of his own. The letters written to his wife, the contestee, in 1889 and years following, flatly contradict the testimony of Albers, Mansfieldt and wife and Rev. Waugh as to many of the declarations claimed to have been made to them by the testator; for these letters show that, instead of detesting, fearing and hating the contestee, he thought a great deal of her. In a letter dated May 27, 1892, he writes, among other things, as follows: "Dear Minnie: Yours of the 23d received last night. I am always so glad when I get a letter from you. Don't I wish we could get together and remain. This is such a poor way to be spending our lives, when it is so short." The letters of the testator to the contestee contained in the record do not indicate that she was the terror of his life, or that he was afraid that she would

burn his home or take his life, as the declarations claimed to have been made by him, and testified to by Mansfieldt and wife and Rev. Waugh, would tend to show. The transcript contains three letters from Mrs. Mansfieldt to the contestee. One of them dated, "Easter Sunday, 1894," referring to Mr. Gwin, contains the following passage: "He would like to see you coming back. That is what he always say." Why like to have Mrs. Gwin come back, if she was the burden and terror of his life? That statement in her letter does not agree with her testimony when she deposed that Mr. Gwin said he hoped Mrs. Gwin would always stay in Idaho, where she then was. The sentiment expressed in the letters of deceased to his wife is very different from that expressed in the declarations of deceased as sworn to by Mansfieldt and wife and deponent Waugh. The testimony as to the mental condition and testamentary capacity of the deceased at the time the will was made, and of his having executed it freely and voluntarily, shown by the transcript, is that of the attesting witnesses, Hawes and Cliff, and, in addition to that, the testimony of Mrs. Albers. Deponent Cliff deposed that Mr. Gwin was of sound and disposing mind, as far as he knew, and that he was not under any restraint or undue influence, at the time the will was made, and that Mrs. Gwin was not present at that time. Hawes deposed that, at the time the will was made, deceased was competent to dispose of his property by will, and that, if he (witness) had not thought he (testator) was competent, he would not have drawn the will for him. Mrs. Albers testified that she was housekeeper for Mr. Gwin at the time the will was drawn, and saw him just before and after the will was executed, and his mental and physical condition was then good.

We find in the record twenty-eight specifications of error in regard to the admission of evidence, and have considered each, but do not think it necessary to pass upon each separately, as they refer in the main to the admission of what was claimed to be declarations of the testator made one, two, three and four years after the execution of said will. However, some of the specifications of error refer to the admission of the

opinions of witnesses formed long after the will was executed. The court erred in its rulings complained of in the following numbered specifications (as numbered in appellant's brief), to wit: 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 20, 21, 22, 23, 25 and 26.

The giving and refusing to give certain instructions to the jury are assigned as error. The court refused to give the following instruction asked by appellant: "The jury in this case are instructed that the plaintiff has failed to introduce evidence sufficient to justify a verdict in his favor, and you must find a verdict for defendant." The court erred in its refusal to give that instruction. The evidence is not sufficient to sustain a verdict for the plaintiff. At most, it is only sufficient to raise a suspicion in his favor. In *Calkins' Estate, supra*, it is said: "In order to justify the submission of any question of fact to a jury, the proof must be sufficient to raise more than a mere conjecture or surmise that the fact is as alleged. It must be such that a rational, well-constructed mind can reasonably draw from it the conclusion that the fact exists, and when the evidence is not sufficient to justify such inference the court should refuse to submit the question to the jury." In the case at bar the evidence was not sufficient to justify the conclusion that the material allegations of the complaint were true, and the court ought to have directed the jury to find a verdict for the contestee. In our view of this case, it is unnecessary for us to pass upon the exceptions to the instructions, the ground of exceptions being that there was no evidence before the jury warranting the giving of said instructions. Instructions must be applicable to the evidence, and, as there was no evidence before the jury authorizing a verdict in favor of the contestant upon the issues made, it was error to give the instructions complained of. An instruction defining an abstract proposition of law, where there is no evidence in the case to which such instruction is applicable, only serves to befog and mislead the jury, and should not be given. (*Calkins' Estate, supra*.) In that case the court says: "A court should adapt its instructions to the evidence which is to be considered by the jury, and, instead of giving to them definitions of abstract propositions of law, should so connect its

instructions with the facts or evidence to which they are applicable as to ·lead them to make the proper application thereof." In *Janin v. Bank,* 92 Cal. 14, 27 Am. St. Rep. 82, 27 Pac. 1100, it is said: "In order to justify the submission of any question of fact to a jury, the proof must be sufficient to raise more than a mere conjecture or surmise that the fact is as alleged." "It must be such that a rational, well-constructed mind can reasonably draw from it the conclusion that the fact exists, and when the evidence is not sufficient to justify such inference the court should refuse to submit the question to the jury." In the case at bar there is absolutely no evidence tending to show that the deceased was laboring under an insane delusion as to the contestant, or that he was not of sound and disposing mind, or that he was under ·duress or undue influence, at the time the will in question was executed, and for that reason it was error to give the instructions complained of.

The order of the court below denying a new trial was error, and must be set aside and a new trial granted, and it is so ordered. On account of the condition of the transcript as first presented to this court, the respondent will not be required to pay the cost of the same. Other costs of this appeal are awarded to appellant.

Huston and Quarles, JJ., concur.