## EFFECT OF ASCENDENCY OF WIFE ON LEGALITY OF HUSBAND'S WILL IN HER FAVOR.

Circuit Court of Cuyahoga County.

HENRY KORNFIELD ET AL. v. LOUISA KORNFIELD ET AL.

Decided, March 23, 1908.

*Wills—Undue Influence—Declarations Concerning Later Will.*

1. The fact that a wife guides or even dominates her husband in the ordinary affairs of life, or has acquired an ascendency over him, does not render his will made in her favor invalid.
2. Declarations of the testator are not of themselves alone sufficient to establish the execution of a lost or destroyed will, but are admissible in evidence and have great weight when corroborated by other evidence.

*Kerruish & Kerruish*, for plaintiffs in error.
*Walter D. Meals* and *Thomas Robison*, contra.

HENRY, J.; WINCH, J., and MARVIN, J., concur.

The plaintiffs in error were contestants of the will of Leopold Kornfield, deceased, in an action begun by them in the court of common pleas, wherein by verdict of the jury said will was sustained. The grounds of contest were, first, that the will was made under undue influence exercised by the testator's second wife, Louisa Kornfield, one of the defendants in error who was the chief beneficiary thereunder, and secondly, that the testator revoked said will by making another and later one, inconsistent with the former. The latter it is claimed was suppressed by testator's wife.

The facts are as follows: Leopold Kornfield, a Hungarian Jew, came to this country in 1880, leaving his wife and five chil-

dren behind. The wife followed later, bringing one child, Benny. The wife soon died in New York, and Benny was put into an institution there. In 1886 Leopold married a second wife, who, it is said, knew nothing of his family in Europe. He soon sent, however, for three of the children there, and later for the remaining child, Simon, a cripple, for whose admission under the immigration law he gave a maintenance bond. Meanwhile he had three children by his second wife.

After his second marriage, the testator was engaged in the saloon business in Newburg until his death. The presence of the first set of children in the household was much resented by the second wife, who constantly domineered over and abused both them and her husband. In 1896, he desired to go to Hungary to see his aged parents, but she refused to allow it until he had made his will giving her all the property, amounting to about $15,000, including $7,000 life insurance, save that the will as actually made bequeathed $1,000 to Simon, the cripple. The testator died in 1903, about seven years after this will was made.

By evidence of testator's declarations the contestants offered, but were not permitted, to show that shortly before his death, he spoke of having made a new will and sent his wife with a written order for the first one to the office of the lawyer, Charles Zuker, Esq., who had drawn the same, and retained it for safe-keeping; that upon her return she handed him the will, remarking that it was good enough for him and that he had made a new will dividing his property evenly between wife and children, and told her to take the old one out and burn it; that she then took it out and on returning repeated her remark that the old will was good enough for her.

The contestants further offered to show by another witness in answer to questions as to whether he had a conversation with the testator about a new will, whether he had seen that new will, and whether he had had it in his hands, that once when witness was moving the bed under him the will fell from under his pillow and he seeing it fall said to witness "Give me that paper; it is a new will I have made." that witness took it, opened it and looked at it, and testator took it and placed it under his pil-

low again; that it was "a large paper" with "names of witnesses
and it was properly executed;" that testator said he had pro-
vided in his new will that he should be buried in the Jewish
Burying Ground in Glenville, that he had given $200 to the old
folks in the old country and divided the rest of his property
evenly among his children.

The contestants further offered to show by testator's child
Simon, in response to inquiry whether he saw a new will made
by his father, that the latter after his health got poor, on one
occasion when Mrs. Kornfield was in the house, took some papers
and picking out one of them handed it to witness and said "This
is the new will;" that witness opened it, saw it was a written doc-
ument, saw two names signed to it as witnesses and his father's
name at the end; that then there was some movement as of eaves-
dropping and testator seized the paper and took it away; that
witness had the means of knowing, and knew, that the papers
were locked up in the wardrobe, and that after testator went
to the hospital where he soon died, Mrs. Kornfield, having access
to the wardrobe, was seen to go there and take papers out.

All the testimony thus offered was excluded and exceptions
were reserved. These rulings constitute one of the errors here
assigned. They will be considered further. It is also com-
plained that the trial court having refused to allow evidence of
undue influence during the seven years interval between the mak-
ing of the original will and testator's death, charged the jury
that they might consider that lapse of time as bearing upon the
issue of undue influence at the time the will was made. The
contention is that the charge though abstractly correct, was mis-
leading in view of the refusal to allow proof of continuance of
the undue influence. We think, however, that the error, if any,
can not be ascribed to any evidence offered, the exclusion whereof
was excepted to, which would tend to show the wife's domination
over her husband between his return from Europe and his death.
The evidence excluded tends rather to show his escape from such
domination.

A third error assigned concerns the weight of the evidence
upon the issue of undue influence. The bill of exceptions does
does not contain a copy of the probate of the will which the stat-
ute requires to be offered and which apparently was offered in

evidence. Whether it is now too late to correct the bill so that we may lawfully weigh the evidence we have not inquired. In examining the alleged error as to the exclusion of evidence we have necessarily considered the facts of the case. Upon this point a very recent case in which the facts are very similar is *Gwin* v. *Gwin*, 48 Pac., 295, and the law is well stated in the opinion of the court at page 301, as follows:

"The fact that a wife guides or even dominates her husband in the ordinary affairs of life, or has acquired an ascendency over him, does not render his will made in her favor invalid."

Giving due heed to all that has been urged upon our attention, we can not say that the jury's verdict is manifestly contrary to the weight of the evidence.

I recur now to the first error assigned, the exclusion of evidence tending to show that the testator made a second will inconsistent with the first. It is urged that enough evidence was offered tending to show the existence and different contents of the second will, and the probable suppression thereof by the testator's wife, to authorize the jury to infer that such second will inconsistent with the first was actually made. Were the rejected evidence hereinbefore recited to be received, the theory of this branch of the contestants' case would necessarily be that the very meager direct evidence of the appearance and nature of the document supposed to be the testator's second will is confirmed by the testator's declarations characterizing it as such and defining its testamentary provisions. Superimposed upon this foundation of proof as to the existence of a document deemed by the testator to be his last will, is the further testimony offered of his wife's access to the place of deposit of that instrument, of her taking papers from said place, of the subsequent non-appearance of the will and of her interest to suppress it. Applying then the maxim *omnia praesuntur in odium spoliatoris*, it is urged that, for the purpose of this case at least, the existence and due execution of a later will, inconsistent with and revocatory of the one under contest, are *prima facie* shown.

It is, however, a fragile edifice which is thus ingeniously reared, and if it be faulty it must collapse like a house of cards. Let us therefore examine it in detail. Consider the paper first

which fell out from under testator's pillow. It was a written document bearing his signature and the names of witnesses. These attributes are not distinguishing characteristics. They are common to various instruments, testamentary contractual and declaratory. If in addition to the signatures, the witness who had the document in his hand, had read therein such words as "I have and bequeath," or "This is my last will and testament," or "I appoint as executor," etc., the paper would be distinguished as of testamentary import, leaving its validity as such to be determined by further evidence. Without some such remark, the self identification of the paper as a will is not even begun.

It is generally conceded, moreover, that a testator's declaration of having made or revoked a will is no independent evidence of the fact. Without some foundation of testimony or presumption as to the fact, such a declaration is not admissible at all. Only as it is offered to confirm or rebut such testimony or presumption, can a testator's declaration in this behalf have any probative force whatever.

It is true that the late case of *Williams* v. *Miles,* 62 L. R. A., 383, seems to hold the opposite view, and there are a few decisions to the contrary following the supposed authority of the leading English case of *Sugden* v. *St. Leonards,* L. R., 1 P. D., 154; but in the later case of *Atkinson* v. *Morris,* L. R., P. D., 1897, p. 40, in which *Sugden* v. *St. Leonards* was discussed, it was held that:

"Declarations made by a testator after the date of an alleged will are not admissible to prove the execution of the will."

So also in a most excellent and exhaustive note to *Clark* v. *Turner,* 38 L. R. A., 433, many cases are cited at page 442 under the caption "Declarations" to the point that:

"Declarations of the testator are not of themselves alone sufficient to establish the execution of a lost or destroyed will, but are admissible in evidence and have great weight when corroborated by other evidence."

This we understand to be in perfect analogy with the distinction made in *Behrens* v. *Behrens,* 47 O. S., 323, where it was held that:

"When a will, once known to exist, and to have been in the custody of the testator, can not be found after his decease, the legal presumption is, that it was destroyed by the testator with the intention of revoking it.

"To strengthen such presumption, it is. competent to prove the declarations of the testator after making his will, that he had destroyed, or intended to destroy the same." See, also, *Tynan* v. *Paschal,* 84 Am. Dec., 619.

Can this gap be bridged over by resort to the maxim *omnia praesuntur in odium spoliatoris?* We think not. In 1 *Wigmore on Evidence,* 291, pages 382, 383, it is said in discussing the act of a spoiler, quoting from the opinion in *McReynolds* v. *McCord,* 6 Watts, 288, 290, that:

"Before he can be fixed with the character of a spoiler, the purport of the paper must be proved to have been what it is surmised to have been."

It follows, therefore, that all the rejected testimony taken together does not tend to prove the existence of the alleged second will revoking the one which was admitted to probate. It is suggested, however, that when the court rejects the first link in a chain of proposed proof, it is not necessary to proceed step by step offering every link and excepting to its rejection; so here, the rejection of testimony that the lost document bore such signatures of testator and witnesses as a will must have, made it unnecessary to proceed further in order to save the point. It is doubtless that the offer should not be full enough in any case not only to indicate in outline what the full chain of proof would be but to embrace an actual tender of some testimony leading unequivocally in that direction. Be this as it may, the offers here were manifestly intended to cover all the facts in the entire chain of proof proposed. They may therefore be considered as we have considered them, in ascertaining whether prejudicial error was committed in the rejection of this evidence.

On the subject of admissibility of evidence our brother Marvin dissents from this opinion from the judgment of the court.

The judgment below is. affirmed.