(November 3, 1923.)

## SOPHIA BARBARA MARGARETA WITTHOFT, Respondent, v. THEODORE H. GATHE, Appellant.

[221 Pac. 124.]

WILLS — SPECIAL FINDINGS — TESTAMENTARY CAPACITY — UNDUE IN-
FLUENCE—CONFLICTING EVIDENCE—RULE APPLICABLE TO WILL CON-
TESTS—NEW TRIAL—APPEAL AND ERROR—MOTION FOR JUDGMENT
NON OBSTANTE VEREDICTO.

1. In a will contest, inconsistency between findings of want of testamentary capacity and of undue influence does not invalidate the judgment for contestant if either finding be supported by the evidence.

2. In a will contest, findings that the deceased was of unsound mind and also unduly influenced at the time of making the will are not inconsistent, the rule being that findings authorizing different judgments are inconsistent while findings authorizing the same judgment are not inconsistent.

3. The rules that all questions of the weight of evidence and the credibility of the witnesses are for the jury and the trial court, and that where the evidence is conflicting, but there is sufficient competent evidence, if uncontradicted, to support the verdict of the jury, the same will not be disturbed on appeal, are applicable to will contests.

APPEAL from the District Court of the Fifth Judicial District, for Bannock County. Hon. O. R. Baum, Judge.

Action to probate a will and a contest of such will. Judgment for contestant. *Affirmed.*

Peterson & Coffin and D. W. Standrod, for Appellant.

The testimony wholly fails to establish testamentary incapacity. (Alexander's Commentaries on Wills, pp. 439–442; *Runkle v. Gates,* 11 Ind. 95; *In re Richardson's Will,* 64 N. Y. Supp. 944; *Langford's Admr. v. Mills,* 189 Ky. 515, 225 S. W. 246; *In re Guilbert's Estate,* 46 Cal. App. 55, 188 Pac. 807; *In re Little's Estate, etc.,* 46 Cal. App. 776, 189 Pac. 818; *Hoban 'v. Piquette,* 52 Mich. 346, 17 N. W. 797; *Roche v. Mason,* 185 N. Y. 128, 77 N. E. 1007; *Wood v. Carpenter,* 166 Mo. 465, 66 S. W. 172; *Hill v. Fly* (Tenn.), 52 S. W. 731; *Todd v. Todd,* 221 Ill. 410, 77 N. E. 680; *In re Casarotti's Estate,* 184 Cal. 73, 192 Pac. 1085.)

The testimony wholly fails to show undue influence in the making of the will in question. (*Pritzchard v. Henderson,* 3 Del. 128, 50 Atl. 217; Thompson on Wills, sec. 530; *Kustus v. Hazer,* 269 Pa. 103, 112 Atl. 45.)

The special interrogatories submitted are inconsistent and antagonistic. (*Gwin v. Gwin,* 5 Ida. 271, 48 Pac. 295; *Stirling v. Stirling,* 64 Md. 139, 21 Atl. 273; 29 Am. & Eng. Ency. of Law, 104; *Barr v. Sumner,* 183 Ind. 99, 107 N. E. 674, 109 N. E. 193; *In re Busham's Estate,* 115 Misc. Rep. 588, 189 N. Y. Supp. 182; *In re Dunn,* 184 App. Div. 386, 171 N. Y. Supp. 1056.)

Where special findings are contradictory new trial must be granted. (*Kerns v. McKean,* 65 Cal. 411, 4 Pac. 404; *Sloss v. Allman,* 64 Cal. 47, 30 Pac. 574; *McBride v. Union Pac. Ry. Co.,* 3 Wyo. 247, 21 Pac. 687.)

C. O. Benting, D. C. McDougall, T. D. Jones and I. E. McDougall, for Respondent.

Where the evidence discloses that the testator did not have a sound and disposing mind at the time of signing the alleged will, the instrument is of no force as a will and must be denied probate. (C. S., secs. 7808, 7452; Alexander's Commentaries on Wills, par. 326.)

Or where the evidence discloses that the purported will was signed by the testator by reason of undue influence exercised upon him. (C. S., sec. 7452; Alexander's Commentaries on Wills, sec. 573.)

In the contest of a will, the weight of the evidence is for the jury, and where the evidence is conflicting the verdict of the jury and judgment of the trial court will not be disturbed by the appellate court, especially after the trial judge has held the evidence sufficient in passing upon a motion for a new trial. (*In re Russell's Estate,* 189 Cal. 759, 210 Pac. 249; *Main v. Yandell,* 110 Kan. 630, 204 Pac. 540; *In re Jones' Estate,* 59 Utah, 99, 202 Pac. 206; *Pedersen v. Moore,* 32 Ida. 420, 184 Pac. 475; *Duncanson v. Williams* (Mo.), 242 S. W. 653; *Deganhardt v. Joplin* (Tex. Civ.), 239 S.W. 692; *Lefever v. Stevenson* (Mo.), 193 S.W. 840; *In re Zobrist's Will,* 179 N. Y. Supp. 425; *In re Donahue's Estate,* 115 Misc. Rep. 586, 188 N. Y. Supp. 760; *In re Hinton's Will,* 180 N. C. 206, 104 S. E. 341; *Bokelman's Will v. Smith* (Iowa), 159 N. W. 975; *Turckheim v. Birkley,* 287 Ill. 434, 122 N. E. 814.)

The special verdicts returned in this case support the judgment and are not inconsistent. (*In re Williams' Estate,* 52 Mont. 192, Ann. Cas. 1917E, 126, 156 Pac. 1087; *Sharp v. Losee,* 109 Kan. 211, 199 Pac. 94; *In re Wiltsey's Estate,* 135 Iowa, 430, 109 N. W. 776; *Hays v. Bowdoin,* 159 Ala. 600, 49 So. 122; C. S., sec. 7452.)

The instructions given and refused cannot be reviewed in this case for the reason that they are not properly before the court. They are not incorporated in the reporter's transcript nor are they settled by a bill of exceptions. (*Sweaney & Smith Co. v. St. Paul Ins. Co.,* 35 Ida. 303, 206 Pac. 178; C. S., secs. 7163, 7166, 7167.)

BUDGE, C. J.—From the record in this case it appears that Theodore A. Gathe and Henry A. M. Witthoft became partners in the year 1901, which partnership continued until 1912, when a corporation was organized which took over the partnership property. The interests of the part-

ners were thereafter represented by stock in the corpora-
tion. Prior to the formation of the corporation, about 1910,
Witthoft became more or less indisposed and his health
began to break. In the same year Witthoft and Gathe made
wills, each becoming a beneficiary under the other's will.
On May 22, 1913, Witthoft gave to his former partner,
Gathe, a full and absolute power of attorney, which was
never revoked. In the early part of 1914 Witthoft went
to Kiel, Germany, and later entered a nerve clinic in that
city where he received medical treatment. Thereafter, about
the month of April, 1914, he returned to the United States
and on March 17, 1915, he married respondent, Sophia
Barbara Margareta Witthoft, with whom he lived until the
date of his death on March 27, 1917. He left surviving
him the respondent and a daughter aged fifteen months.

In the month of August, 1917, respondent filed her peti-
tion for letters of administration and in September, 1917,
she was appointed administratrix of the estate of her de-
ceased husband and in October, 1917, brought an action,
as administratrix, in the district court, against appellant
and others, for the purpose of obtaining possession of prop-
erty held by them and to which they claimed ownership
by reason of a certain letter referred to in the record as
"the letter of explanation," which purports to make an
assignment of stock in the corporation known as the Com-
mercial Development and Investment Company, under the
terms of which letter of explanation appellant was to re-
ceive twenty-five shares of the stock in said corporation
standing in the name of the deceased, Witthoft. The final
determination of this particular action, under stipulation
of counsel, is to be governed by the disposition made of
the instant case.

On the 5th day of December, 1917, approximately nine
months after the death of Witthoft, appellant filed for
probate a document purporting to be the last will and
testament of Henry A. M. Witthoft. In the probate court
respondent contested the application of appellant for pro-
bate of the alleged will. Upon a hearing had before that

court the will was rejected. Thereafter an appeal was taken to the district court, which resulted in the will being again rejected. Prior to the entry of the judgment appellant moved the court for judgment *non obstante veredicto,* which motion was, by the court, overruled and judgment on the verdict was thereafter entered rejecting the will, from which judgment and from an order denying a motion for a new trial this appeal is prosecuted.

Appellant specifies and relies upon twenty-three assignments of error. The first fourteen errors assigned involve the action of the court in the giving and refusing to give certain instructions to the jury. These errors cannot be reviewed by this court for the reason that the instructions are not called for by the praecipe, they are not included in the reporter's transcript settled and allowed by the trial court, and are not included in the clerk's certificate to the clerk's transcript. (C. S., secs. 7163, 7166 and 7167; *Sweaney & Smith Co. v. St. Paul Ins. Co.,* 35 Ida. 303, 206 Pac. 178; *Stringer v. Redfield,* 34 Ida. 378, 201 Pac. 714.)

The fifteenth assignment of error involves the action of the court in submitting to the jury certain interrogatories, which, with the answers of the jury, are as follows:

Interrogatory No. 1: "At the time of the execution of the will herein in question, was said Henry A. M. Witthoft acting under undue influence, as in these instructions defined?"

Answer: "Yes."

Interrogatory No. 2: "At the time of the execution of the will here in question, was said Henry A. M. Witthoft of sound mind?"

Answer: "No."

It is the contention of appellant that the above interrogatories submitted to the jury and their answers thereto are inconsistent, antagonistic and contradictory and therefore a new trial should be granted. In support of this contention appellant relies upon the case of *Gwin v. Gwin,* 5 Ida. 271, 48 Pac. 295. That case is not in point for the reason that the jury in that case found that the deceased, at the

time of the making of the will, was competent to make it and also found that the deceased at the time of making said will was not of sound and disposing mind. These two findings are inconsistent and contradictory and the court properly held that a new trial should be granted for that reason. The distinction between the case at bar and the Gwin case is that in the latter the special findings would authorize different judgments while in the instant case different judgments based upon the special findings would not be authorized.

In a similar case, *In re Murphy's Estate,* 43 Mont. 353, Ann. Cas. 1912C, 380, 116 Pac. 1004, where the jury found that the testator was not competent to make a will and was also unduly influenced, the court said:

"But counsel say that the two findings are inconsistent, in that the one negatives the existence of the fact found in the other; in other words, that the finding that the deceased executed the alleged will under the impulse of undue influence exerted by the defendant implied testamentary capacity. A person enfeebled in mind and body, though still retaining testamentary capacity, may be more readily swayed and influenced by those about him, than when in his normal condition; yet, in a legal sense, undue influence cannot be exerted upon a person who is so far insane or unconscious as to be destitute of testamentary capacity. (*Gwin v. Gwin,* 5 Ida. 271, 48 Pac. 295; *Stirling v. Stirling,* 64 Md. 139, 21 Atl. 273; 29 Am. & Eng. Ency. of Law, 2d ed., 104.) When in this condition a person is without intelligent volition; he is for that reason not legally responsible for his acts, whether they are prompted by others or not. Undue influence imposes a restraint on the will of the testator, who, but for the restraint, would be free and responsible, so that his testamentary act is not the result of his own volition, but of the will of another. Therefore the findings involve conclusions which cannot logically stand together, and in this sense are inconsistent; yet they are not inconsistent in the sense that each requires the rendition of a different judgment and thus mutually destroy each

other. This is the test by which must be determined the question whether the judgment as rendered should be allowed to stand.

"The findings are not so intimately connected that error in the one implies error in the other. Hence, if either be supported by the evidence, and it does not appear that substantial error intervened affecting it, the other may be regarded as immaterial. (*Dexter v. Codman,* 148 Mass. 421, 19 N. E. 517.) In this case it was said: 'It is a mistaken assumption that the issues as to sanity and undue influence, in a case of this kind, are necessarily so connected that error in a finding upon one of them implies error in the finding upon the other. In many cases, perhaps in most, they are very closely connected. In some the connection is slight and unimportant. Where there is a close connection, sometimes it is such that an error in relation to the former would almost certainly involve an error in regard to the latter, while an error in regard to the latter would not be likely to affect the finding upon the former. Sometimes a very important part of the evidence of undue influence is the mental condition of the testator and sometimes the proof comes chiefly from overt acts of coercive tendency. In the same case there may be evidence tending to show insane delusions affecting the disposition which a testator seeks to make of his property, and evidence of undue influence which has hardly any relation to his mental peculiarity. How far the fact that a jury has gone astray in dealing with one issue shall be deemed important in considering a motion to set aside their findings upon another must depend upon the relations of these issues to each other in the particular case, the evidence introduced upon each, and any facts and circumstances which throw light upon the nature or probable cause of the jury's mistake. And, finally, each issue is to be dealt with by itself, in view of the evidence, and of all that has occurred in the course of the proceedings.'

"The court should have directed the jury to omit an answer to the second interrogatory if they should answer

the first in favor of the plaintiff, and *vice versa*. But that this course was not pursued does not necessarily require a reversal of the judgment, if either finding is justified by the evidence.''

To the same effect see: *In re Williams' Estate*, 52 Mont. 192, Ann. Cas. 1917E, 126, 156 Pac. 1087; *Dexter v. Codman*, 148 Mass. 421, 19 N. E. 517; *Woodbury v. Obear*, 7 Gray (Mass.), 467.

The sixteenth assignment of error attacks the action of the court in denying appellant's motion for judgment *non obstante veredicto*. .This assignment is not discussed in appellant's brief and we are therefore justified in assuming that the same is waived.

The seventeenth, eighteenth, nineteenth, twentieth and twenty-second assignments of error involve the sufficiency of the evidence to justify the verdict and judgment. We shall not undertake to review at great length the testimony in this case, for the reason that it would make the opinion unduly lengthy, but will confine ourselves to what we deem the most important testimony introduced by both appellant and respondent.

We will first call attention to the evidence of the two subscribing witnesses, Williams and McNichols, both of whom testified in the probate court and also in the district court. In the probate court the testimony of these witnesses is clearly to the effect that when they signed the purported will in McNichols' place of business they did not understand, neither were they informed that they were attesting a will as witnesses. They testified that they were informed by Gathe that he wanted them to sign as witnesses written documents that contained an agreement of long standing between the appellant and the deceased. Upon the trial in the district court, at the morning session, the witness Williams testified in like substance and effect as upon the hearing in the probate court. At the afternoon session the record is convincing that his testimony was changed in some important particulars. In the probate court the witness testified that he got the impression that the paper was a will

from what he read.  He admitted that he was asked in the probate court if he did not remember that Gathe stated that it was a will and he answered that he did not remember that he said it was a will; that his recollection was that when he was approached by Gathe to sign the purported will that he was asked to witness "an old standing agreement" between himself (Gathe) and Witthoft.

In the probate court the witness, McNichols, testified that the word "will" was not used; that the deceased stated to the witness that he desired him to witness what was "an old agreement." He also testified that he was not informed that it was a will; that he did not understand it that way; that he "did not remember of the word 'will' being used."

After a conference with Gathe during the trial in the district court, both of these witnesses in substance and effect testified that when they signed as witnesses they knew that they were attesting a will and that it was the last will and testament of the deceased.

We are not called upon to pass upon the weight or credibility of the testimony of the two attesting witnesses to the will.   That is a matter left to the jury to be considered in connection with all of the testimony introduced upon the trial.

Attention is now called to the testimony of respondent's witnesses in opposition to the probate of the will.

Mrs. Maud Scott, among other things, testified:

That she had been acquainted with Mr. Witthoft for twelve or fifteen years; that she had worked for him beginning in 1909; that she had seen him nearly every day for a long period of time; that there were times when he did not eat and times when he could not work on the block (he was a butcher by trade) for a period of two or three weeks because his arm and body would be sore and had to be bandaged; that he was so sick that he could not enter the shop; that after he was married the witness had to help him over the viaduct; that he could hardly walk; that he used a cane; that in 1910 his health began to fail; that he acted flustered and excited when Gathe was around;

that he never carried on any business but what he asked Gathe about; that he seemed to be growing worse; that Gathe would instruct him what to do and he would do it; that he could not remember; that he took no interest in the business as he formerly did; that when he returned from Germany he was thinner and his face was yellow and drawn; that he seemed childish; that she saw deceased every two or three days from the time he returned from Germany until June 5, 1915, the date of the purported execution of the will; that after Witthoft returned from Germany his walk was not steady; that he could not remember; that when he was at the table he had to be told to wipe his nose and had to be waited on like a child; that his hands were so shaky that he could hardly get food to his mouth; that he would fall down when he walked; that he used to go along the street with his lower lip hanging down; that he could not close his mouth; that water would be dripping out of the sides of his mouth; that on the 5th of June, 1915, the date of the purported execution of the will, he walked "like an animal that had been hit in the head"; that he could not do anything; that he never seemed the same after he came back from Germany and that he had failed right along; that he was taking treatments with a certain medicine that he injected into his arm; that his arms were broken out; that he was not rational on June 5, 1915.

The witness McLaughlin testified:

That he had known the deceased very well from the year 1910; that he frequently met him and had meals with him; that he met him after his return from Germany and that he was a changed man compared to his condition when he went to Germany; that he mumbled; that he trembled; that his mouth was open and that he was very thin and yellow.

The witness Dorothy Budtke testified:

That she was a stenographer and worked for Gathe and Witthoft in the early part of 1915 in their office; that she worked there for a year and three months; that Witthoft

was nervous; that his memory was very poor; that he came
to the office only the first couple of months that she was
there; that he did not dictate any letters and that he never
used a typewriter all the time that she was there; that there
was not a great deal of bookwork done by Mr. Witthoft
and that later a man was called in to straighten up the
books.

The witness Tschudy testified:

That his place of business adjoined that of Witthoft and
Gathe; that he saw Witthoft nearly every day from 1907
to 1913; that in 1907 Witthoft was a capable business man;
that he began to break down physically between 1907 and
1913; that he returned from Germany in 1914 and shortly
after his return he had a talk with him; that his physical
condition was considerably worse at that time; his com-
plexion was pale and pasty and he was nervous; that both
knees trembled when he stood; that he had a tremor in
his voice when he talked and he had gone back mentally
as well; that he was not responsive in his speech; that he
saw him in the spring of 1915 and his physical condition
was still on the decline; that he could hardly walk and
he had failed mentally; that in his opinion Witthoft, on
the 5th day of June, 1915, did not have the power mentally
to reason from cause to effect.

Respondent, deceased's wife, testified:

That she met the deceased at her home in Germany
in 1913; that she next saw him in a nerve clinic in Kiel,
Germany, that was in February, 1914; that they were mar-
ried on March 17, 1915; that in the middle of May, 1915,
he fainted; that he complained of headaches; that he was
shaking and trembling during the year 1915; that he was
sick at the time of their marriage and continued to grow
worse; that his memory grew worse after their marriage;
that in the year 1915 he bought a brass bed and had it
put in an empty room and locked up so that Gathe could
not see it; that he kept it there for several months; that
in June or July, 1915, he bought some strawberries but he
had to go to Mr. Gathe for the money; that when he came

back he took the strawberries and threw them down and said that Mrs. Gathe was saving money; that she knew of the kind of treatment he was taking; that it was by injection; that while at Kiel he was locked in a room and the medicine was hypodermically injected into his arm; that after their marriage he would go to the drug-store to get prescriptions filled and would forget to take the prescriptions; that his mind grew worse; that in the year 1915 she found him shaving his face without lather; that he tried to use a typewriter but could not; that he would try to play the piano; that he would try to play a typewriter like a piano and laugh about it; that he was exactly like a child; that in 1915 in attempting to frame a picture he cut off the head of the picture in order to make it fit the frame.

One Sellars testified as an expert and gave certain evidence for the purpose of proving that Witthoft was not the author of the typewritten document purporting to be his last will and testament.

There is other evidence in the record to the effect that the deceased, at the time the alleged will is said to have been executed, was in such a physical and mental condition that he was not competent to make a will.

Appellant, to establish the competency of the deceased to make a will, called numerous witnesses.

Mrs. Bolscheid testified:

That she had known Witthoft for a number of years; that she saw him probably once a day; that she met him frequently after the 13th of September, 1916; that she traveled east with him on the same train; that she talked to him about his wife and baby; that he had some kodak pictures of both his wife and baby of which he was evidently very proud; that in her opinion the deceased was of sound mind.

The witness Eppie E. Hoffhine testified:

That she lived at and assisted in running the Commercial Hotel, owned by the deceased and Gathe; that she ran the hotel from 1913 to 1917; that she saw deceased during that

time every day as his office was in that building and the witness cleaned the office twice a week or oftener; that in 1915 deceased transacted business, taking money and making out receipts; that he was working on the books; that he was perfectly rational and was of sound mind on June 5, 1915.

The witness R. W. Hoffhine, husband of the previous witness, testified:

That he ran the Commercial Hotel from 1913 to 1917; that he had business dealings with Witthoft during this period; that Witthoft made up a statement for him concerning lots purchased by the witness' wife in the latter part of May or the first of June, 1915; that during the entire summer of 1915 he paid his rent to Witthoft; that he saw him engaged in work in the office during the summer and saw him engaged in work upon a will; that "he was copying one will to another" on a typewriter; that this was the latter part of May or the first of June, 1915; that the witness on this occasion went to him for a statement on the lots and Witthoft asked him if he was in a hurry; that witness answered that he was not and that Witthoft said: "I am copying a will here and it is a little tedious. If you would just as soon wait until this afternoon I would like to get through with this while I am at it as I have both wills here and it is tedious to read and write both"; that later Witthoft came to the witness with the will and said it was completed and asked him if he would sign as a witness as he and Gathe wanted to get the wills completed; this was about the first of June; that witness excused himself from signing on the ground that he was a transient and that Witthoft had better get a property owner; that Witthoft and Gathe then went directly to McNichols' pool-hall; that Witthoft was competent on June 5, 1915.

The witness L. D. Franklin, cashier of the Bannock National Bank, testified:

That he had known Witthoft for several years; that Witthoft was secretary of the Pocatello Cold Storage Company, which company carried an account at the Bannock National

Bank (this witness identified a bundle of checks which were drawn on account of the Pocatello Cold Storage Company by Witthoft during the month of May, 1915, and also in July, 1915); that Witthoft was of sound mind on the 5th day of June, 1915; that he made deposits at the bank and called for his statements; that he was in the bank about every day during part of 1915; that he made payments to the witness of checks covering a large transaction with Franklin and Hayes.

The witness Hoff testified:

That he was acquainted with Witthoft during his lifetime; that he became acquainted with him at Kiel, Germany, in 1913; that Witthoft lived with his mother at Kiel for a short time; that he was in a nerve clinic in that city; that he knew him prior and subsequent to his marriage; that he traveled with him from Kiel, Germany, to the United States; that at the time they sailed from Germany Witthoft's appearance was fine; that he walked about and talked about as usual and cared for himself; that he ate his meals regularly three times a day; that he talked about his business; that he was neat and clean in his personal appearance; that upon their arrival in New York they spent several days sightseeing; that they went from New York to Washington, D. C., where they spent a short time visiting; that they also visited in Clinton, Iowa, where Witthoft had relatives; that they arrived in Pocatello in April, 1914; that he lived with Witthoft at the Commercial Hotel; that Witthoft worked in his office in that building until 1916; that he was in good health when he was married; that he saw no change in him after his marriage but that he looked the same as usual; that he worked for Gathe and Witthoft and that the latter paid him by check; that in his opinion Witthoft was of sound mind on the 5th day of June, 1915.

The witness Merrill testified:

That he knew the deceased from 1909 to the time of his death; that he was in and out of his office doing business with him on various occasions; that he was a subscribing

witness to a will made by the deceased in 1910; that he had numerous dealings with him up to 1915.

The witness Douglas testified:

That he knew Witthoft from 1907 to the time of his death; that he met him frequently two or three times a week; that in 1915 he was apparently quite active; that he remembered his appearance on June 5, 1915, and stated that the deceased looked about the same as usual; that he was not walking with a cane in 1915; that in August, 1915, Witthoft was keeping books; that he became sick in 1916, at which time the witness was running a taxi business in Pocatello and Witthoft frequently called up and ordered a taxi to take him to various places in town; that he talked freely about business and other pertinent subjects; that in his opinion the deceased was competent on the 5th day of June, 1915; that he did not stagger when he walked; that he never noticed his hands shake and that he was perfectly calm and his mind appeared to be perfectly good.

The witness Bistline, a stockholder in the Pocatello Cold Storage Company and also in the Pocatello Transit Company, testified:

That Witthoft was secretary of these two companies and looked after the business; that in his opinion the deceased, on the 5th day of June, 1915, was of sound mind.

Appellant Gathe testified at length in reference to different business transactions carried on by the firm of Witthoft and Gathe; that certain checks were signed by Witthoft and the amounts were filled in by him, due to the fact that Witthoft did not know the exact amount to be filled in. He denied that he prepared the purported will but testified that Witthoft prepared it himself. He testified that Witthoft used a typewriter and that he, Gathe, did not, but later in his testimony stated that he also used a typewriter. He further testified that the attesting witnesses, McNichols and Williams, were each told that the instrument they were asked to witness was the last will and testament of the deceased, and in fact that the will was in all respects

executed as prescribed by statute, and that on June 5, 1915, Witthoft was competent.

Other evidence of like character, touching the competency of the deceased to make a will, was offered as well as evidence tending to show that no undue influence was used.

We have attempted to set out what we consider the material evidence offered by the appellant and respondent touching the matter of the competency of the deceased to make a will and also such material evidence as appears in the record bearing upon the question of undue influence. As to the latter, we do not deem it of sufficient importance to call for further notice. The real question involved here is whether on June 5, 1915, Witthoft was competent to make a will. Whether he was or was not became a question of fact. The jury not only had a right to consider the evidence touching the competency of the deceased to make a will but it was also within their prerogative to consider the evidence of the attesting witnesses and whether or not they had been impeached or contradicted during the trial. That there is a sharp conflict in the testimony must be conceded. The witnesses for the respondent, without exception, testified positively that the deceased, on June 5, 1915, and for some time prior thereto, was incompetent to make a will; that he was without mental capacity due to an illness which was progressive in its nature and which ultimately so affected his mind that he could not reason from cause to effect and was without mental capacity to understand or comprehend the purpose of the transaction involved, and that he actually did not know, as a matter of fact, the nature, extent and value of his property or the persons who were to be the recipients of his bounty. There is ample competent evidence to justify the jury in reaching the conclusion that, due to the nature of the disease with which Witthoft was afflicted, his mind was so affected as to render him incompetent to dispose of his property by will or otherwise. While the record is silent as to the malady from which he suffered, the symptoms are so clearly given that the particular disease may be readily recognized.

If he was without mental capacity he could not make a valid will.

On the other hand appellant and his witnesses testified without equivocation touching the matter of the competency of the deceased that he was competent to make a will; that he labored under no mental disability and that his physical condition was not of such a serious nature that it in any way impaired his mental faculties.

The question of the mental capacity of the deceased and whether he was competent or incompetent was squarely submitted to the jury, which found him to be incompetent on June 5, 1915. Whatever our individual opinions may be, in view of the conflict in the testimony we are bound by the jury's finding. In this regard the same rule of law is controlling in an action of this nature as in any ordinary case. The rule is so well known to both the bench and bar that its repetition would seem superfluous, namely, that where there is a conflict in the evidence but there is sufficient competent evidence, if uncontradicted, to support the verdict the same will not be disturbed on appeal. In a recent case decided by the supreme court of California (*In re Ramey's Estate,* 62 Cal. App. 413, 217 Pac. 135, at page 140) the rule is tersely stated as follows:

"In will contests the rule is the same as in other proceedings, that all questions of the weight of the evidence and the credibility of the witnesses are for the jury and the trial court, and if there be any substantial evidence to support the finding or verdict it cannot be set aside by the reviewing court, although said court might believe the great preponderance of the evidence was the other way."

To the same effect, see *In re Snowball's Estate,* 157 Cal. 301, 107 Pac. 598; *In re O'Connor's Estate,* 51 Cal. App. 339, 196 Pac. 792; *In re Jones' Estate,* 59 Utah, 99, 202 Pac. 206; *In re Nutt's Estate,* 181 Cal. 522, 185 Pac. 393, Again, in the Ramey case, *supra,* at page 142, the court said:

"The rule is . . . . that if a rational inference may be drawn from the evidence in favor of the finding of the

jury the appellate court is bound by it, although it may believe that a contrary conclusion would have been more reasonable and satisfactory.''

Coming now to the twenty-first assignment of error, that the court erred in sustaining respondent's objection to the question propounded to the witness McNichols, namely: ''I will ask you, Mr. McNichols, whether at the time of signing the will Mr. Witthoft was in a condition of mind to perform and do the ordinary transactions of life?'' there is no merit in this assignment.

The last assignment specifies as error that the court erred in overruling the objection of appellant's counsel to the question propounded to the witness Hoff: ''Do you belong to the Sons of Herman?'' It is strenuously insisted by appellant that in permitting this question to be asked the witness it had a tendency to inflame the minds of the jury and to prejudice their minds against appellant, the inference being that to be a member of or to be in sympathy with such an organization imputed disloyalty. The question was upon an immaterial matter and should not have been asked the witness and the court should have sustained the objection, but we do not think it constituted such prejudicial error as would warrant a reversal on that ground. This is particularly true in view of the fact that both the appellant and respondent are of German descent, and we would hesitate to entertain the thought that a jury made up of substantial and law-abiding citizens of this country would even give passing notice to the fact that one of the witnesses at one time was a member of an organization known as the Sons of Herman.

Finding no reversible error in the record, the judgment is affirmed, and it is so ordered. Costs are awarded to respondent.

Dunn and William A. Lee, JJ., concur.